# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | No. 4:19-CR-00085 |
| v. | | (Judge Brann) |
| ZAKHARY WAYNE PRYER, | | |
| Defendant. | | |

## MEMORANDUM OPINION

### AUGUST 19, 2020

## I.   BACKGROUND[1]

In 2019, Zakhary Wayne Pryer was indicted for five counts of distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), one count each of possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1), possession of firearms in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A), possession of firearms by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k).[2]

That indictment arose from a police investigation that began in October 2018, when the Pennsylvania State Police ("PSP") utilized a confidential informant ("CI")

---

[1]   In this memorandum, the Court cites to the parties' paper submissions in this matter. However, the Court also relies on the testimony provided by the witnesses during the suppression hearing held by this Court on July 21, 2020. Where no citation is provided, the Court relies solely upon witness testimony.

[2]   Doc. 1.

to conduct a series of controlled purchases of heroin and cocaine base from Pryer.[3] On October 12, 2018, October 24, 2018, November 2, 2018, and November 7, 2018, the CI conducted controlled purchases of various quantities of heroin and/or cocaine base from Pryer at Pryer's residence located at 1819 Whitford Avenue, South Williamsport, Lycoming County, Pennsylvania ("Whitford Avenue Residence").[4]

On November 19, 2018, the CI received a telephone call from Pryer requesting the CI's assistance—in exchange for cocaine base—in moving to a new residence.[5] The CI and another individual assisted Pryer and loaded a U-Haul truck with belongings from the Whitford Avenue Residence.[6] During the move a handgun fell out of a couch, to which Pryer replied that he had "forgot" that the handgun was in the couch, and placed it in his waistband, and later in his vehicle.[7] After approximately two hours, Pryer and the CI moved Pryer's possessions into his new residence at 2054 Mahaffey Lane, Old Lycoming Township, Lycoming County, Pennsylvania ("Mahaffey Lane Residence").[8] This move was witnessed by both the CI—who assisted in moving boxes into the new residence—and police surveillance units.

---

[3]   Doc. 39-1 at 1-13. In addition to the controlled purchases, in September 2018 the CI witnessed a drug transaction between Pryer and another individual, but there was no police involvement in this transaction. *See* Doc. 39-2 at 4.
[4]   *Id.*
[5]   *Id.* at 14.
[6]   *Id.*
[7]   *Id.*
[8]   *Id.* at 15.

The CI then arranged to purchase a bundle of heroin from Pryer; Pryer informed the CI that he did not have the heroin at that time and would need to get it later.[9] Further along in the evening, the CI returned to the Mahaffey Lane Residence and conducted a controlled purchase of one bundle of heroin from Pryer inside the residence.[10] This information was related to a state magisterial district judge in an affidavit in support of a search warrant for the Mahaffey Lane Residence.[11] On November 19, 2018, the search warrant was issued.[12]

PSP did not immediately execute the search warrant but, instead, continued to surveil the residence until approximately 10:00 or 10:30 p.m. and returned at approximately 3:00 or 3:30 a.m. on November 20, 2018 to continue their surveillance. PSP did not execute the search warrant until November 20 due to concerns for the safety of police officers executing the warrant and because PSP protocols call for the unit to execute warrants in the early morning hours.

So on the morning of November 20, 2018, police executed the search warrant on the Mahaffey Lane Residence;[13] Pryer was discovered inside the residence, as were two other individuals.[14] At approximately 6:16 a.m., PSP Corporal Tyler Morse

---

[9]   *Id.*
[10]  *Id.* at 15-16.
[11]  *See* Doc. 39-2.
[12]  *Id.*
[13]  Police recovered from the residence, among other items, heroin, cocaine, methamphetamine, and marijuana, as well as three firearms, ammunition, and approximately $4,000.
[14]  Doc. 39-1 at 16.

arrived at the Mahaffey Lane Residence and placed Pryer into his police vehicle.[15] It is undisputed that Pryer was in custody at that time, and that PSP intended to arrest Pryer.

As soon as Pryer was placed in the police vehicle, Corporal Morse read Pryer his full *Miranda*[16] warnings.[17] Those warnings were provided in the presence of a Detective Caschera, although Corporal Morse did not have Pryer sign a written *Miranda* waiver form. Pryer orally acknowledged that he understood his *Miranda* rights and agreed to speak with Corporal Morse. Pryer was calm, coherent, and did not appear to be under the influence of drugs or alcohol. Corporal Morse made no threats or promises to induce Pryer to speak with him.

After Pryer acknowledged that he understood his *Miranda* rights, he informed Corporal Morse that there were two firearms inside his residence—one was under his bed, and another was inside of the bedroom closet.[18] Pryer also stated that he had hidden cocaine, cocaine base, heroin, and marijuana, along with approximately $3,000, in an Arizona tea can with a false bottom that was in his bedroom.[19] The car

---

[15]  *Id.*

[16]  *Miranda v. Arizona*, 384 U.S. 436 (1966). In *Miranda*, the Supreme Court held that, pursuant to the Fifth Amendment's privilege against self-incrimination, a person in custody and subjected to interrogation must "first be informed in clear and unequivocal terms that he has the right to remain silent" and "that anything said can and will be used against the individual in court," and be informed of his "right to consult with counsel prior to questioning," the right "to have counsel present during any questioning if the defendant so desires," and that "if he is indigent a lawyer will be appointed to represent him." *Id.* at 467-70, 473.

[17]  Doc. 39-1 at 16.

[18]  *Id.*

[19]  *Id.*

ride to the PSP Station in Montoursville, Pennsylvania ("PSP Montoursville") lasted approximately fifteen to twenty minutes.

After arriving at PSP Montoursville, Corporal Morse turned Pryer over to other officers and left to interview other witnesses. Corporal Morse later returned to PSP Montoursville and, at approximately 7:30 a.m., brought Pryer to use the restroom. While Pryer used the restroom, he and Corporal Morse spoke, and Pryer initially denied having sold any narcotics from the Mahaffey Lane Residence. When Corporal Morse stated that he knew Pryer had sold heroin from that location at least once, Pryer admitted that he had in fact sold heroin from the Mahaffey Lane Residence one time.[20] During this conversation, Pryer appeared comfortable and Corporal Morse made no threats or promises to induce Pryer to speak. Pryer was not re-*Mirandized* during this conversation.

At approximately 9:30 a.m. on November 20, PSP Trooper Ryan Kelly interviewed Pryer. Pryer answered Kelly's questions about his drug dealing activities and admitted that two firearms discovered during a search of the Mahaffey Lane Residence were his. Pryer was calm and cooperative and was not threatened in any way or promised anything to speak with Trooper Kelly. Pryer was not re-*Mirandized* during this discussion. Finally, at approximately 11:00 a.m., Pryer was arraigned before a magisterial district judge.[21] Without prompting, Pryer volunteered

---

[20]   *Id.* at 17.
[21]   *Id.* at 18.

that he sold heroin for $65 to $80 per bundle, and that the CI must have kept some of the money provided to him for the controlled purchases.

In December 2019, Pryer filed a motion to suppress evidence seized as a result of the search of the Mahaffey Lane Residence, and to suppress statements that he made to police after he was taken into custody.[22] Pryer argues that the affidavit in support of the search warrant "lacks probable cause and fails to identify a nexus between the crimes alleged and [2054 Mahaffey Lane]."[23] Specifically, Pryer contends that the affidavit would establish probable cause to search the Whitford Avenue Residence, but does not link any drug trafficking activity to the Mahaffey Lane Residence, particularly since the police affidavit states that Pryer informed the CI on November 19, 2018 that did not have heroin at the time, which implies "that there was nothing stored in the Mahaffey Lane Residence."[24] Pryer also asserts that the good faith exception does not apply, as there could be no good faith belief that probable cause existed to search the Mahaffey Lane Residence.[25] Finally, Pryer argues that his statements to the police should be suppressed because he was not given proper *Miranda* warnings.[26]

The Government responds that there was ample probable cause to support a search of the Mahaffey Lane Residence, since the affidavit established that Pryer

---

[22] Doc. 28.
[23] Doc. 29 at 2.
[24] *Id.* at 4.
[25] *Id.* at 5-6.
[26] *Id.* at 7-9.

was a long-time drug trafficker and had sold a controlled substance from the Mahaffey Lane Residence at least once on the day that police applied for the search warrant.[27] Moreover, even if there was no probable cause, the Government contends that the good faith exception applies, as reliance on the search warrant was objectively reasonable.[28] Finally, the Government argues that Pryer knowingly and voluntarily waived his *Miranda* rights when he spoke with police.[29]

In July 2020, this Court conducted a hearing on Pryer's motion so that it could receive testimony from any witnesses and render credibility assessments, if necessary. The Government presented testimony from Corporal Morse, while Pryer's girlfriend, Shawna Hakeem, testified for the defense. This matter is now ripe for disposition and, for the following reasons, Pryer's motion will be denied.

## II.   DISCUSSION

Pryer seeks to suppress both the evidence seized during the execution of the search warrant for the Mahaffey Lane Residence, and his subsequent statements to the police. With respect to Pryer's motion to suppress physical evidence, "[a]s a general rule, the burden of proof is on the defendant who seeks to suppress evidence . . . [and] only once the defendant has established a basis for his motion does the burden shift to the government to show the search was reasonable."[30] As to Pryer's

---

[27]   Doc. 39 at 11-14.

[28]   *Id.* at 15-17.

[29]   *Id.* at 18-23.

[30]   *United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013) (internal citation and quotation marks omitted).

motion to suppress his statements to the police, "[t]he burden is on the Government to establish, by a preponderance of the evidence, that a challenged statement was voluntary."[31]

## A.    Evidence Seized from the Mahaffey Lane Residence

Pursuant to the Fourth Amendment's prohibition on "unreasonable searches and seizures,"[32] police must generally obtain a warrant—supported by probable cause—before conducting a search.[33] When determining whether a warrant is supported by probable cause, "[a] reviewing court may not conduct a *de novo* review of a probable cause determination."[34] Rather, "[t]he duty of a reviewing court is 'simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.'"[35] "[I]f a substantial basis exists to support the magistrate's probable cause finding, [this Court] must uphold that finding even if a different magistrate judge might have found the affidavit insufficient to support a warrant."[36] Although this Court must "not merely rubber stamp a magistrate's conclusions, [it] must heed the Supreme Court's direction that 'doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.'"[37]

---

[31] *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005).

[32] U.S. CONST. AMEND. IV.

[33] *See, e.g.*, *Maryland v. Dyson*, 527 U.S. 465, 466 (1999).

[34] *United States v. Golson*, 743 F.3d 44, 53 (3d Cir. 2014) (citing *Illinois v. Gates,* 462 U.S. 213, 236 (1983)).

[35] *United States v. Miknevich*, 638 F.3d 178, 182 (3d Cir. 2011) (quoting *Gates,* 462 U.S. at 238 (ellipsis omitted)).

[36] *Id.* (internal quotation marks omitted).

[37] *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (quoting *Gates,* 462 U.S. at 237 n.10 (internal citation omitted)).

"A magistrate may find probable cause when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"[38] The United States Court of Appeals for the Third Circuit has "held that probable cause is a fluid concept that turns on the assessment of probabilities in particular factual contexts not readily, or even usefully, reduced to a neat set of legal rules."[39] "The supporting affidavit to a search warrant is to be read in its entirety and in a common sense, nontechnical manner."[40]

### 1. Whether the Search Warrant was Supported by Probable Cause

Here, there was ample probable cause to support the search warrant. The affidavit submitted to the magisterial district judge detailed several drug transactions beginning in September 2018 stretching through November 19, 2018.[41] All but one of these transactions occurred between Pryer and a CI and were monitored by police, and the CI was searched both before and after the purchases to ensure that any narcotics recovered from the CI were sold by Pryer.[42] Although most of these sales occurred at the Whitford Avenue Residence, the transaction that occurred on

---

[38] *Miknevich*, 638 F.3d at 182 (quoting *Gates,* 462 U.S. at 238).
[39] *Id.* (internal quotation marks omitted).
[40] *Id.*
[41] Doc. 39-2 at 4-6.
[42] *Id.*

November 19, 2018—the same date that PSP applied for the search warrant—

transpired inside the Mahaffey Lane Residence.[43] The affidavit relates that:

> At approximately 1513 hours, PRYER called the CI via telephone and told the CI that he had the bundle, referring to the bundle of heroin. PRYER called the CI via his telephone number of [redacted]. From previous controlled buys, I know that PRYER sells bundles of heroin for $100 a piece.

> At approximately 1530 hours, I searched the CI and no contraband was found. For this controlled buy, l utilized a PSP vehicle. I was the driver and the CI was the front seat passenger. I provided the CI with $100 in prerecorded currency.

> At approximately 1538 hours, the CI called the above listed phone number and spoke with PRYER, who the CI knows as "H". The CI asked PRYER if I could drive directly to his residence and PRYER yelled at the CI and told the CI no.

> At approximately 1539 hours, I parked in a parking area on Mahaffey Ln., just east of US-15. The CI then walked west on Mahaffey Ln. At approximately l541 hours, Tpr. Kenneth FISHEL viewed the CI walk north in the driveway of 2054 Mahaffey Ave. towards the front south door of the residence. At approximately 1542 hours, Tpr. FISHEL stated that the CI was walking south from the driveway of 2054 Mahaffey Ln. and then east towards my vehicle. At approximately 1543 hours, the CI entered my vehicle and immediately relinquished one bundle of blue waxine bags containing suspected heroin. We then left the area.

> I later debriefed the CI. The CI stated that he/she went inside the front door of 2054 Mahaffey Ln. The CI met with PRYER inside the residence. The CI gave him $100 in prerecorded currency and PRYER gave the CI one bundle of suspected heroin. PRYER and the CI spoke briefly and the CI left the residence.

---

[43] *Id.* at 5-6.

I searched the CI at approximately 1547 hours, I searched the CI and no contraband was located.[44]

This information establishes a direct nexus between Pryer's drug trafficking and the Mahaffey Lane Residence. Moreover, the Third Circuit has held that it is "a reasonable inference to conclude that drug dealers often store evidence of drug crimes in their residences."[45] This inference is present where there are "three preliminary premises: (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's drug activities."[46]

Here, all three preliminary premises are met. First, the affidavit detailed a number of drug transactions between Pryer and the CI, demonstrating that Pryer was a drug dealer.[47] Second, the affidavit expressed that Pryer had just moved his personal belongings to "his new residence,"[48] 2054 Mahaffey Lane, which demonstrates that the Mahaffey Lane Residence was Pryer's domicile. Although the defense sought to undermine this premise with Shawna Hakeem's testimony, the Court concludes that her testimony does not undermine that premise for two reasons.

First, the Court finds portions of Hakeem's testimony irrelevant, and other portions of her testimony incredible. Hakeem testified that Pryer's lease for the

---

[44] *Id.* at 6.
[45] *United States v. Burton*, 288 F.3d 91, 104 (3d Cir. 2002).
[46] *Id.*
[47] Doc. 39-2 at 4-6.
[48] *Id.* at 5.

Mahaffey Lane Residence did not begin until November 20, 2018—the day after he moved his property into that house—and that workers were still repairing the property on the evening of November 20, after Pryer's arrest. This, while believable, does not undermine the available evidence that—as discussed below—demonstrates Pryer moved into the residence on November 19.

Hakeem further testified that she did not recognize any of the belongings that were pictured inside the Mahaffey Lane Residence,[49] and that none of the items appeared to belong to Pryer. These belongings included, among other things, beds, sheets, a television, a portable artificial fireplace, sofas, a dresser, and dumbbells. Hakeem's demeanor during her testimony on this point appeared to the Court to be evasive and not worthy of trust. Furthermore, it simply strains credulity that none of the objects inside of the Mahaffey Lane Residence were recognizable as belonging to Pryer in light of the clear evidence that Pryer had moved his possessions into that home.

That evidence includes the fact that the CI informed police that he had moved Pryer's belongings out of the Whitford Avenue Residence—where Pryer was listed as the lessee—and into the Mahaffey Lane Residence on November 19.[50] Furthermore, police units surveilling Pryer that day witnessed him moving belongings from the Whitford Avenue Residence and into the Mahaffey Lane

---

[49]  These items were photographed by PSP after the search warrant was executed.
[50]  Doc. 39-1 at 14-15.

Residence. Perhaps most importantly, it is undisputed that Pryer was found inside the Mahaffey Lane residence in the early morning hours of November 20, 2018, when police executed the search warrant and arrested him. Finally, photographs of the residence that were taken after Pryer's arrest show clear indications that someone was living in that home—there were sheets on a bed, a towel was hanging over the shower curtain rod, and soap and shampoo were located in the shower. Collectively, this strongly indicates that Pryer had moved his belongings into the Mahaffey Lane Residence, and undercuts Hakeem's testimony that she did not recognize any of the objects within the home.

Second, even if Hakeem's testimony were credible—which it is not—it does not appear that any police officers had any knowledge that some or all of the items in the Mahaffey Lane Residence may not have belonged to Pryer. Importantly, when reviewing "a probable cause finding . . . made by a neutral magistrate in connection with a warrant application," a court's focus must remain on the "'facts and circumstances within the officer's knowledge' at the time of the arrest, irrespective of later developments."[51] There is simply no indication that the police had access, at the time that they applied for a search warrant, to any information provided by Hakeem, or any information that indicted Pryer had not moved into the Mahaffey Lane Residence. To the contrary, as discussed above, the information available to

---

[51] *Geness v. Cox*, 902 F.3d 344, 357 (3d Cir. 2018) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).

police demonstrated that Pryer had moved his belongings into the Mahaffey Lane Residence. For that reason, Hakeem's testimony—even if credible—would not undermine the existence of probable cause. Thus, the Court concludes that PSP could reasonably believe that the Mahaffey Lane Residence was Pryer's domicile, and the second premise is satisfied.

Finally, the affidavit in support of the search warrant detailed a drug transaction that had occurred within the Mahaffey Lane Residence, demonstrating that the home contained contraband that linked it to Pryer's drug trafficking activities.[52] That Pryer had earlier on November 19, 2018 informed the CI that he did not have heroin at the moment and "was going to get heroin later"[53] does not undermine this conclusion. Approximately two hours after Pryer made that statement, he informed the CI that he had obtained the heroin to sell to the CI, the CI proceeded to the Mahaffey Lane Residence, and Pryer sold heroin to the CI from inside that location.[54] This is more than sufficient to conclude that Pryer likely had heroin inside the Mahaffey Lane Residence.

Accordingly, all three preliminary premises were present, and the magisterial district judge had reason to infer that evidence of Pryer's drug trafficking activities would be found inside the Mahaffey Lane Residence.[55] Consequently, the magistrate

---

[52] Doc. 37-2 at 6.
[53] Doc. 37-1 at 15.
[54] *Id.* at 15-16.
[55] *Burton*, 288 F.3d at 104.

had a substantial basis to conclude that the search warrant application was supported by probable cause, and Pryer's Fourth Amendment rights were not violated by the search of the Mahaffey Lane Residence.

### 2.    Good Faith Exception

The Court also finds that, even if the warrant were invalid, pursuant to the good faith exception the evidence resulting from that search should not be excluded. "The exclusionary rule is a prudential doctrine that prevents the government from relying at trial on evidence obtained in violation of the Fourth Amendment's strictures."[56] "However, the rule is *not* intended to remedy Fourth Amendment violations, and does not necessarily apply each time a violation occurs."[57]

"Accordingly, in determining whether the exclusionary rule applies, [this Court must] engage in a cost-benefit analysis, balancing the deterrence benefits of suppression against its substantial social costs."[58] The United States Supreme Court has made clear that "[s]uppression of evidence . . . has always been our last resort, not our first impulse."[59] Thus,

> Where the particular facts of a case indicate that law enforcement officers acted with an objectively reasonable good-faith belief that their conduct was lawful, or when their conduct involved only simple, isolated negligence, there is no illicit conduct to deter. In such circumstances, the deterrence rationale loses much of its force and exclusion cannot pay its way. Alternatively, where law enforcement

---

[56]   *United States v. Werdene*, 883 F.3d 204, 215 (3d Cir.) (brackets and internal quotation marks omitted), *cert. denied*, 139 S. Ct. 260 (2018).

[57]   *Id.*

[58]   *Id.* (brackets and internal quotation marks omitted).

[59]   *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

conduct is deliberate, reckless, or grossly negligent or involves recurring or systemic negligence, deterrence holds greater value and often outweighs the associated costs.[60]

The existence of a search warrant is usually sufficient to establish that an officer conducted a search in good faith, but there are cases in which an officer's reliance on a warrant is not reasonable and would fail to trigger the good faith exception.[61] In determining whether the good faith exception applies, this Court must determine "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."[62] This may occur in the following narrow situations:

(1) when the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;

(2) when the magistrate judge abandoned his judicial role and failed to perform his neutral and detached function;

(3) when the warrant was based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; or

(4) when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.[63]

Pryer does not contend that the first three exceptions apply but, instead, argues that "the warrant was so facially deficient that it failed to particularize the place to

---

[60]   *Werdene*, 883 F.3d at 215-16.
[61]   *United States v. Hodge*, 246 F.3d 301, 307-08 (3d Cir. 2001).
[62]   *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984).
[63]   *Hodge*, 246 F.3d at 308 (brackets omitted).

be searched or the things to be seized," as the information provided probable cause only as to the Whitford Avenue Residence.[64] Contrary to Pryer's contention, as detailed above, there is evidence that Pryer sold heroin from the Mahaffey Lane Residence on the very day that police applied for the search warrant. Pryer's well-established history of drug trafficking, together with the nexus linking his trafficking activities to the Mahaffey Lane Residence, firmly established that narcotics could be expected to be found at that location.

The Court does note that there is an apparent error in the affidavit in support of a search warrant, where Corporal Morse wrote that Pryer possessed a firearm, but was prohibited from possessing a firearm due to a previous conviction for murder in the first degree.[65] This is not possible because, in Pennsylvania, a conviction for murder in the first degree carries a sentence of no less than life imprisonment.[66] Corporal Morse testified that this mistake was inadvertent, as this information was included in Pryer's "rap sheet" which Corporal Morse had reviewed. Even striking this information from the affidavit, as discussed above, there is ample evidence to demonstrate that Pryer engaged in drug trafficking from the Mahaffey Lane Residence, and the warrant cannot be deemed so facially deficient that the good faith exception would not apply. Accordingly, the Court concludes that the good faith exception would apply here even if the search warrant were deemed deficient.

---

[64] Doc. 29 at 6.
[65] Doc. 39-2 at 5.
[66] 18 Pa. Stat. and Cons. Stat. Ann. § 1102(a)(1) (West 2012).

## B.      Statements Made After Pryer was Taken into Custody

Finally, Pryer argues that he was not given proper *Miranda* warnings and, thus, his statements to police should be excluded.[67] "*Miranda* itself held that '[t]he defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly and intelligently.'"[68] Two factors are relevant to this inquiry:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.[69]

"The ultimate question in the voluntariness calculus is 'whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution.'"[70]

The Court concludes that Pryer was provided his full *Miranda* warnings during the ride from the Mahaffey Lane Residence to PSP Montoursville. Certainly, PSP's failure to obtain a signed *Miranda* waiver is a deviation from what the Court would consider best practices. However, Corporal Morse testified credibly that the

---

[67]   Doc. 29 at 7-9.
[68]   *Fahy v. Horn*, 516 F.3d 169, 194 (3d Cir. 2008) (quoting *Miranda v. Arizona,* 384 U.S. 436, 444 (1966)).
[69]   *Id.* (quoting *Moran v. Burbine,* 475 U.S. 412, 421 (1986)).
[70]   *Id.* (quoting *Miller v. Fenton,* 474 U.S. 104, 112 (1985)).

full *Miranda* warnings were provided to Pryer, and no testimony or evidence has been provided to the contrary.

Additionally, Corporal Morse's testimony establishes that Pryer was not under any duress, coerced in any way, or given any promises prior to speaking with police. Pryer was calm and cooperative, appeared to understand the warnings, and did not appear to be confused or under the influence of drugs or alcohol—all of which indicates that Pryer understood his *Miranda* rights and voluntarily waived those rights.

Further supporting this conclusion is the fact that Pryer has a lengthy criminal history dating back to 1998—a history that includes arrests for serious offenses.[71] This establishes that Pryer "was familiar with his rights, having been involved in the justice system on numerous previous occasions."[72] Moreover, "[t]he circumstances of his interrogation do not provide any reason to think that the waiver was involuntary."[73] He was initially questioned in the police vehicle, then in the restroom at the police station, at the holding area of the station, and at the arraignment later in the day,[74] "with nothing to indicate coercion or discomfort."[75]

Although there was a gap of some time between when the *Miranda* warnings were provided and subsequent questioning of Pryer, and Pryer was not re-

---

[71] Doc. 39-3.

[72] *United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005).

[73] *Id.*

[74] Doc. 39-1 at 16-17.

[75] *Pruden*, 398 F.3d at 246.

*Mirandized*, "*Miranda* . . . does not necessarily require that a suspect be warned anew each time he is questioned."[76]

> Instead . . . the question of whether a time lapse renders *Miranda* warnings "stale" may be reduced to answering two questions: (1) At the time the *Miranda* warnings were provided, did the defendant know and understand his rights? (2) Did anything occur between the warnings and the statement, whether the passage of time or other intervening event, which rendered the defendant unable to consider fully and properly the effect of an exercise or waiver of those rights before making a statement to law enforcement officers?[77]

As discussed previously, Pryer knew and understood his rights when he was first provided his *Miranda* warnings. Moreover, it does not appear that the short passage of time between the warnings and Pryer's later statements—approximately five hours at the longest—or any intervening event rendered Pryer unable to consider fully and properly the effect of a waiver of his rights before making additional statements to the police.[78]

Accordingly, the Court concludes that Pryer knowingly and voluntarily waived his *Miranda* rights, and no subsequent temporal gaps in his questioning rendered his waiver stale. Therefore, Pryer's motion to suppress his statements will be denied.

---

[76] *Id.*

[77] *Id.* at 246-47.

[78] *See id.* at 243 ("Although some twenty hours passed between the time that Pruden was read his rights (and made of an earlier statement, which followed a valid *Miranda* waiver) and the questioning that led to his confession, we conclude that Pruden was clearly aware of his rights, and that no intervening events prevented him from making a knowing and intelligent waiver"); *Guam v. Dela Pena*, 72 F.3d 767, 769-70 (9th Cir.1995) (fifteen-hour delay between waiver and statement did not require new *Miranda* warnings).

### III.   CONCLUSION

For the foregoing reasons, the Court concludes that Pryer's Fourth Amendment rights were not violated by the search of the Mahaffey Lane Residence, and he knowingly and voluntarily waived his *Miranda* rights. Accordingly, Pryer's motion to suppress will be denied.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge